# IN THE COURT OF APPEALS OF IOWA

No. 19-0905
Filed September 25, 2019

**IN THE INTEREST OF N.H.,**
**Minor Child,**

**J.M., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, District Associate Judge.

        A father appeals the termination of his parental rights to his one-year-old child. **AFFIRMED.**

        Michael M. Lindeman of Lindeman Law, Cedar Rapids, for appellant father.

        Thomas J. Miller, Attorney General, and Anna T. Stoeffler (until withdrawal) and Mary A. Triick, Assistant Attorneys General, for appellee State.

        Kimberly Opatz of Linn County Advocate, Cedar Rapids, attorney and guardian ad litem for minor child.

        Considered by Tabor, P.J., and Mullins and May, JJ.

**TABOR, Presiding Judge.**

Jesse is the father of one-year-old N.H. He contends the juvenile court erred in terminating his parental rights to his daughter. After reviewing the record,[1] we conclude N.H.'s significant and complex medical needs outstrip Jesse's abilities as a parent. We thus affirm termination of his parental rights.

## I. Facts and Prior Proceedings

N.H. was born in January 2018 at just twenty-four gestational weeks. Her mother, Jacqueline, admitted having no prenatal care and drinking alcohol throughout her pregnancy.[2]

N.H. has severe health issues and spent her first eight months in the neonatal intensive care unit (NICU) at the University of Iowa Hospitals and Clinics. N.H. has impaired vision and hearing and a cleft palate and requires a brain shunt and feeding tube. She sees thirteen different specialist medical providers and participates in speech therapy, occupational therapy, and physical therapy. She needs home nursing care and monthly shots to prevent contracting respiratory infections. She is severely immune-compromised and can become seriously ill from a simple infection. She is also developmentally delayed. Her health problems and cognitive delays will continue throughout her lifetime.

---

[1] We review termination-of-parental-rights cases de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). While not bound by the juvenile court's fact findings, we give them weight, particularly on credibility issues. *Id.* The State must present clear and convincing evidence to support the termination. *In re A.M.*, 843 N.W.2d 100, 110–11 (Iowa 2014). Evidence satisfies that standard if no serious or significant doubts exist about the correctness of conclusions of law drawn from the proof. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). The child's best interests remain our primary concern. *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019).

[2] The court terminated Jacqueline's parental rights. She did not appeal.

The Iowa Department of Human Services (DHS) removed N.H. from Jacqueline's care a few days after her birth because Jacqueline was behaving erratically at the hospital.

During her pregnancy, Jacqueline told Jesse he was the father. When the DHS removed N.H. from Jacqueline's care, she told the workers that Jesse was the baby's father. The DHS moved to establish paternity. But Jesse declined to see N.H. until the testing came back.

In August 2018, after paternity testing established Jesse was N.H.'s father, the DHS began providing him services. Jesse received parenting instruction from family safety, risk, and permanency (FSRP) services.

In October 2018, the hospital discharged N.H. and DHS placed her with her foster mother, Alex, where she has remained through this case. The FSRP offered Jesse weekly visitation. Of fifty-four scheduled visits, Jesse attended forty. Between November 2018 and January 2019, Jesse refused to have visits because he did not get along with the FSRP worker.

The FSRP worker consistently noted critical flaws in Jesse's care of N.H. during visitations. For example, Jesse did not change her diaper unless prompted and sometimes not even when prompted. He would spend only a short time holding her before trying to put her to bed. He did so even when the FSRP worker said N.H. did not need sleep. He rarely participated in feeding her. The FSRP worker testified she had to check continually that the feeding tube was still connected to N.H.'s stomach. The tube disconnected frequently during Jesse's visits but not at other times. Based on his inattention to N.H.'s basic needs, the

FSRP worker testified she would not be comfortable recommending unsupervised visitation.

Related to the feeding tube, foster mother Alex testified when the tube falls out only minutes can elapse before the hole starts to "close up." N.H. must always be close to an emergency reinsertion kit. Alex testified the FSRP worker has reported the tube slipping but being able to reinsert it. The tube has never fully come out of N.H.'s stomach. But only because the FSRP worker was supervising Jesse. Replacing the tube would otherwise require surgery. Alex also testified she must track how much nutrition N.H. takes in so the child will continue to gain weight. Alex has trouble gauging N.H.'s calorie intake after visits with Jesse because the tube has slipped so often.

Alex also explained the intensity of N.H.'s needs:

> She needs care round the clock. She cannot attend day-care yet because of her immune system, so I stay at home with her. You have to get up three times in the middle of the night to start her feed again. She's on a drip feed for the entire night. She vomits sometimes in the middle of the night so you have to be very vigilant and make sure that if that's happening that you turn her on her side, because she can choke.

Jesse participated in an overnight training experience while N.H. was still in the NICU. Providers reported this hospital experience was not successful and N.H.'s needs are too great for Jesse to handle alone.

Jesse also struggled to appreciate the fragility of N.H.'s health. For instance, despite doctor's instructions and FSRP worker's reminders, Jesse continued to kiss N.H. on the lips, exposing her to bacteria, a serious risk given her compromised immune system. Jesse suggested the DHS wanted to prevent him from bonding with N.H.

The juvenile court ordered Jesse to undergo a psychological evaluation. The evaluator reported Jesse has borderline intellectual functioning with limited insight into N.H.'s medical issues and his own ability to care for a child with complex medical needs. Intelligence testing placed him in the fourth percentile. If the court placed N.H. in Jesse's care, the evaluator believed Jesse would need a lot of additional instruction, support, and resources. But Jesse identified his only family support as his adult son. That son was required to register as a sex offender and could not be around N.H. When asked if N.H. could be exposed to his son, Jesse responded, "He's her brother."

The State petitioned to terminate Jesse's parental rights in January 2019. At the hearing, Jesse argued he could take N.H. home that day. Jesse does not work, but he receives about $800 per month in social security disability benefits. He has a home with a furnished room for N.H. He has a driver's license and access to his son's car. But the DHS worker testified placing N.H. with Jesse would be contrary to her welfare. She emphasized the "dangerous combination" of N.H.'s acute medical needs and Jesse's inability to provide a high level of care.

The DHS worker also testified N.H. has become integrated into her foster home. The foster family is willing to become a permanent placement for her. The guardian ad litem reported the foster family is knowledgeable about N.H.'s needs and meets those needs consistently.

The juvenile court terminated Jesse's parental rights under Iowa Code section 232.116(1), paragraph (h) (2019). The court decided termination was in N.H.'s best interests so she could have a permanent placement, perhaps by adoption. The juvenile court also found the circumstances did not warrant

postponing permanency to give Jesse more time to reunify with his daughter. Jesse appeals.

## II. Statutory Grounds

Jesse contends the State failed to show N.H. could not be returned to his home "at the present time." *See* Iowa Code § 232.116(1)(h)(4); *A.M.*, 843 N.W.2d at 111 (interpreting statutory language "at the present time" as the time of the termination hearing). He argues he can care for N.H. now.

The evidence disproves Jesse's contention. While we admire Jesse's devotion to N.H. and his sincere desire to be a parent, the record shows he cannot manage his daughter's basic needs, much less her intensive medical conditions. Jesse hesitated to diaper N.H. or help with her feedings during supervised interactions. The providers of the hospital training program felt Jesse could not care for N.H. on his own overnight. In addition, he has minimized the risk to N.H. from exposure to bacteria.

The DHS worker testified his parenting deficiencies could be life-threatening to N.H. because of her medical condition. Because visitation never progressed to overnights, we have no evidence of Jesse being able to monitor N.H.'s sleep routine, as Alex described doing in the foster home.

Along with daytime home and overnight care, N.H. must attend regular appointments with thirteen different medical specialists. Jesse has a driver's license but no car. It is not clear how Jesse could ensure N.H. received the necessary medical care. Jesse also provided little assurance he would not expose N.H. to his adult son who is a registered sex offender.

Considered as a whole, the evidence is clear and convincing that Jesse could not meet the high demands of N.H.'s care at the present time.

## III. Best Interests

Next, Jesse contends it is not in N.H.'s best interests to terminate his parental rights. In making the best-interests determination, we give primary consideration to the child's safety, the best placement for furthering her long-term nurturing and growth, as well as her physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). That consideration may include a child's integration into her foster family and whether the foster family is willing to adopt. *See* Iowa Code § 232.116(2)(b). Safety and the need for a permanent home mark the "defining elements in a child's best interest." *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially).

Jesse cannot meet N.H.'s complex needs. And the foster family has shown it is capable of doing so. They have expressed an interest in adopting her.

Clear and convincing evidence shows severing Jesse's parental rights and freeing N.H. for adoption are in her best interests.

## IV. Closeness of Parent-Child Relationship

Jesse alleges termination would be detrimental to N.H. because of the closeness of their parent-child bond. *See* Iowa Code § 232.116(3)(c). The evidence shows Jesse loves N.H. and is gentle and caring during visits. But beyond that, the workers report little evidence of a significant bond. Jesse did not meet N.H. until she was eight months old, though Jacqueline told him during her pregnancy that he was the father. Since then, he has had forty visits and cancelled

fourteen. Section 232.116(3)(c) does not preclude termination under these circumstances.

## V. Additional Time

Finally, Jesse contends he should have been given additional time to work toward reunification. To grant an extension of six months, under Iowa Code section 232.104, the court must determine the need for removal will no longer exist at the end of that time. *In re A.A.G.*, 708 N.W.2d 85, 89 (Iowa Ct. App. 2005). We cannot make such a determination here. The DHS worker testified it was not likely Jesse could improve his parenting skills in the foreseeable future. Jesse has not shown the progress necessary to postpone permanency for N.H.

We affirm the juvenile court order terminating Jesse's parental rights.

**AFFIRMED.**